OPINION OF THE COURT
Carol Berkman, J.
At different times in 1981, the petitioners each worked in “wire rooms” of a bookmaking operation answering phones, taking bets, occasionally setting “lines”, and so forth. Each was separately arrested coincident to the execution of two different search warrants. Each was charged in New York County with promoting gambling and each convicted. New Jersey now seeks to prosecute each of them for numerous counts of promoting gambling in the third degree and possession of gambling records.[1] The Governor of this State has signed unrestricted discretionary extradi *914 tion warrants for each. Each petitioner contends that pursuant to CPL 570.16 he should not be extradited because (1) the crimes with which he is charged in New Jersey are no longer punishable in this State because of the aforementioned conviction here; and (2) that the acts which they are charged with committing in this State did not “intentionally [result] in a crime in New Jersey”. The indictment could not resolve the latter issue since New Jersey claims territorial applicability on the basis of section 2C:l-3 (subd a, par [1]; subd c) of the New Jersey Code of Criminal Justice (jurisdiction if either the conduct or result occurs in New Jersey; intent not required unless conduct or result not an offense in State in which conduct occurred). A hearing was held before this court to resolve the issue of whether the defendants are charged with an act intentionally resulting in a crime in New Jersey.[2]
THE FACTS
At the hearing it was stipulated by each petitioner that he had been engaged in bookmaking operations as a “sitter” in New York County on the pertinent dates. It was also agreed that Donald Hingos, also known as “Sam”, was a major bookmaker with many clients from New Jersey. A significant number of the bettors who used the two wire rooms lived in New Jersey and in New York; and a significant number of the telephone calls came from each State. The operation may have had as many as five wire rooms at one time in 1981. Reich worked from October 25, 1981 to November 11, 1981; Torello worked from April 28, 1981 to May 26, 1981.
A number of self-made tape recordings[3] were played. Various documents were admitted as evidence. In addition, Investigator Smith, of the Monmouth County Prosecutor’s Office, testified as an expert. The hearing presented no credibility issue.
*915 Sitters in this operation did not only take bets, which they were trusted to do accurately and “honestly” (i.e., without claiming a bet made after an event had been made before). They gave out code names to clients and sometimes got clients of their own. They were also trusted to change “lines” or odds for certain bettors. They also gave accountings to the bookmakers. As the tapes showed for both petitioners, they gained familiarity with certain frequent callers, particularly Sam. It was also a fair inference that petitioners were at the bottom of the bookmaking “corporate structure”. In the hundreds of hours of tape only one or two conversations per petitioner were found arguably evincing a knowledge that any of the bettors and/or bookmakers were from New Jersey. Of course a number of the events for which bets were placed occurred in New Jersey.
On May 7, 1981, Sam and Torello had a telephone conversation in which Sam asked for Stevie and then, when told Stevie was not there, left a number. The investigator testified that the number belonged to Sam’s Newark business, but Sam did not so specify. He said “589-2826”, and then he elaborated, “That’s this side of the water.”
In another conversation on May 2,1981, after discussing wins and losses with Torello, Sam says, “I just got out of the car on the Parkway.”
On November 5, 1981, Sam had a conversation with Reich. One “Kojak”, who placed bets for various clients, had called and wanted to meet with Sam the next day. The records for the week reveal that Kojak’s clients were overdue on paying $7,000 and it is a fair inference that this was to be the subject of the meeting and that Reich knew it. Reich announced Kojak’s desire for a meeting between 3:00 and 6:00 p.m. the next day, and Sam specified an exit of the New Jersey Turnpike near Newark Airport, described his car and asked that Kojak describe his as well. It is apparent from the conversation that Reich carefully wrote down the message. Reich said Kojak had said he would call back at “nine” for the message. Sam said he would call Willie “tomorrow” to get Kojak’s car description. There is no evidence before this court that Reich delivered the message to Kojak, that Sam had the projected conversation with *916 Willie the next day, or that the meeting between Kojak and Sam occurred at all, much less in New Jersey.
The petitioners presented no evidence.
CONCLUSIONS OF LAW
CPL 570.16 provides that “[t]he governor of this state may also surrender * * * any person in this state charged in such other state * * * with committing an act in this state * * * intentionally resulting in a crime in the state whose executive authority is making the demand”.
Petitioners having denied their intention that a crime result in New Jersey, the People are required to prove such intent prima facie (People v Hinton, 40 NY2d 345, 353). The intentional causation of a crime in the demanding State is, in effect, the statutory functional equivalent of the constitutional requirement that the defendant be a fugitive from the demanding State.
While presence in the demanding State is not necessary, some nexus is required by due process. (1936 Report of NY Law Rev Comm, Appendix A, pp 46-47.) That nexus is provided in the statute by the requirement of a showing that the defendant intended a crime to be committed in the demanding State.
In this case there is no question whatever that each petitioner knowingly participated in a substantial and illegal bookmaking operation in New York State. In so doing, they spoke with large numbers of people. Each was prosecuted and convicted in this State for doing so. But there is no evidence that either “knew with whom he was dealing”, as did the petitioner in People ex rel. Grillo v Holtzman (91 AD2d 983, 984). Grillo was employed as a branch manager for a New York bank and one of the victims of his check-kiting scheme was a Pennsylvania corporation. Here, however, was no legitimate business. Where the bookmakers or the bettors came from was as irrelevant to the betting as the location of the horse race or football game on which the bet was placed.
Thus, in People ex rel. Weiss v Menna (25 AD2d 399,401), a general purpose of distributing an obscene movie nationally did not establish a specific intent to distribute the film *917 in the demanding State where that act was performed by an independent contractor.
There is virtually no evidence that either petitioner knew Sam’s illegal operation was New Jersey based or intended to further Sam’s bookmaking operation in that State.
Each petitioner called Sam by his street name, not his real name. There is no evidence either knew that name or had any personal familiarity with him. Certainly, the fact that petitioners were involved in this bookmaking operation which attracted many New Jersey bettors does not itself establish prima facie an intent that a crime be committed in New Jersey. That inference is simply too speculative.
As to petitioner Torello, he took a telephone number from Sam which happened to be for a Newark business and which Sam ambiguously referred to as being “this side of the water.” That description, to a person in Manhattan, surrounded by water, could easily refer to Queens, Brooklyn or Staten Island even if Sam was understood as referring to a side of the water other than the Manhattan side. As to the reference to a parkway in another conversation, the court is unable to understand any context to that conversation which places that parkway in New Jersey rather than Queens or Long Island, or which establishes that getting off the parkway had anything to do with illegal gambling.
As to Reich, the evidence is only slightly more compelling. Kojak’s clients owed a lot of money which on November 5 was past due. It is a fair inference that Reich was familiar with the debt and that he easily divined the purpose of the projected meeting. Helping to arrange the financial aspects of a bookmaking operation constitutes promoting gambling both in New York and New Jersey. (Penal Law, § 225.00, subd 4; § 225.05; NJ Code of Crim Justice, § 2C:37-2, subd a, par [2].) It should be noted, however, that there is no evidence that Reich delivered the message, that the message was delivered at all, or that the meeting came off. While Kojak was to call later that evening and Sam was to call the next day, neither conver *918 sation was offered in evidence and cannot be presumed to have occurred.
Only if it can be inferred both that Reich delivered the message or caused the message to be delivered and also that the meeting took place can it be said that Reich intentionally caused a crime to be committed in New Jersey. Thus, it has not been established except by speculative inference on speculative inference that any act of Reich actually intentionally resulted in a crime in New Jersey.
It is also noted that this same telephone conversation establishes a certain lack of familiarity between the various participants. Sam had to tell Reich what kind of car he drove. Sam did not know what Kojak looked like, and apparently neither did Reich, since he was to ask Kojak what kind of car he was driving. It should go without saying that merely arranging one casual meeting in New Jersey would not necessarily alert Reich to the fact that Sam’s bookmaking operation was New Jersey based.
There is also some doubt whether Reich is charged with the act (to wit, delivering the message), which intentionally resulted in the crime (to wit, the Kojak-Sam meeting) in New Jersey. He is not charged with merely advancing gambling activity by arranging one of “its financial or recording phases,” but with receiving or accepting in any one day, more than five bets totaling more than $1,000. (NJ Code of Crim Justice, § 2C:37-2, subd b, par [l].)[4] To the extent that the extradition statute is literally read, then, Reich may not come within its ambit. There is no precedent either to support or refute such a literal reading and in view of this court’s findings, it is unnecessary to reach the issue.
For the reasons set forth herein, the writ is sustained as to each petitioner.

. NJ Code of Grim Justice, § 2C:37-2, subd a, par (2); subd b, par (1); and § 2C:37-3, subd a, are identical in all pertinent respects to sections 225.00,225.05 and 225.15 of the Penal Law.

. This court declines to read the phrase “would be punishable by the laws of this State” in the restrictive manner proposed by the petitioners. The purpose of the extradition statute is met if the act was punishable at the time of the crime. (Cf. People v Hinton, 40 NY2d 345,353 [age of victim at time of crime, not time of trial, controls when age an element of crime].) It is further noted that nothing in the history of the statute suggests that it was designed to abrogate the dual sovereignty doctrine.

. Telephone conversations to the wire room were deliberately recorded by the sitters in order to keep a record of bets, etc.

. The People have conceded that the intended crime must be one actually charged in the indictment.